# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 13, 2011

No. 11-10086

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ARMANDO PORTILLO-MUNOZ

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before GARWOOD, GARZA, and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:

### FACTS AND PROCEEDINGS BELOW

On July 10, 2010, the Castro County, Texas, Sheriff's department was notified that a person at the Rodeo Arena in Dimmit, Texas, was "spinning around" on a red motorcycle with a gun in his waistband. A Dimmit Police Officer arrived at the scene and found a .22 caliber handgun in the center console of a four-wheeler driven by defendant-appellant Armando Portillo-Munoz. Portillo indicated to the officers present that the gun was for killing coyotes. After searching his person, officers found a dollar bill in Portillo's pocket with a white powder substance inside the folds. Portillo was arrested and

booked in the Castro County jail for unlawfully carrying a weapon and for possession of a controlled substance. He admitted to being a native and citizen of Mexico illegally present in the United States. According to Portillo's Presentence Report (PSR), he first came to the United States in 2005 but left after six months. Portillo illegally reentered the United States in 2009 and had been present for one year and six months before this incident. At the time of his arrest, he was working as a ranch hand in Dimmit. He stated that he obtained the firearm to protect the chickens at the ranch from coyotes. He had been employed there since January 2010, prior to which he had worked at a dairy farm in Hereford, Texas. His PSR did nor report any prior criminal history, arrests, or previous encounters with immigration officials.

Portillo was indicted on August 31, 2010 for one count of Alien, illegally and unlawfully present in the United States, in Possession of a Firearm under 18 U.S.C. § 922(g)(5). His attorneys filed a motion to dismiss, alleging that conviction under the statute would violate the Second Amendment and the Due Process Clause of the Fifth Amendment. The district court denied Portillo's motion to dismiss. Portillo then entered a conditional guilty plea on January 12, 2011. He admitted that he is a citizen and native of Mexico illegally present in the United States and that he knowingly possessed a firearm in or affecting commerce which had been shipped or transported in interstate commerce. The district court sentenced him to ten months imprisonment followed by three years of supervised release. Portillo filed a timely notice of appeal.

## DISCUSSION

### I.

### Second Amendment

Portillo raises two arguments on appeal: that his conviction under 18 U.S.C. § 922(g)(5) for being an illegal alien in possession of a firearm violates the Second Amendment and that his conviction violates the Fifth Amendment's Due Process Clause. We address the Second Amendment argument first.

We review *de novo* the constitutionality of federal statutes. *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009). Portillo clearly reserved the right to appeal the denial of his motion to dismiss on Second Amendment grounds in his conditional guilty plea.

Under the laws of the United States, "[i]t shall be unlawful for any person . . . who, being an alien . . . illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(5). There is no question that Portillo's conduct violated this statute. We are only asked to decide if Portillo's conviction under this statute violates the United States Constitution. Whether the protections contained in the Second Amendment extend to aliens illegally present in this country is a matter of first impression in this circuit. Several district courts have previously considered the constitutionality of this statute, but none of our sister circuits have done so.

The text of the Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear

3

Arms, shall not be infringed." In 2008, the Supreme Court held in *District of Columbia v. Heller* that the Second Amendment guarantees an individual right to possess and carry weapons. 128 S.Ct. 2783 (2008). The individual laying claim to the Second Amendment's protections in *Heller* was a United States citizen, so the question of whether an alien, illegal or legal, has a right to bear arms was not presented, and the Court took care to note that it was not purporting to "clarify the entire field" of the Second Amendment. *Id.* at 2821. However, the Court's language does provide some guidance as to the meaning of the term "the people" as it is used in the Second Amendment. The Court held the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* Furthermore, the Court noted that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset" before going on to say that "[w]e start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 2790-91. The Court's language in *Heller* invalidates Portillo's attempt to extend the protections of the Second Amendment to illegal aliens.[1] Illegal aliens are not "law-abiding citizens" or "members of the political community," and aliens who enter or remain in this country illegally and without authorization are not Americans as that word is commonly understood.

Prior to its decision in *Heller*, the Supreme Court interpreted the meaning of the phrase "the people" in the context of the Fourth Amendment and indicated

---

[1]And, nothing in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), suggests otherwise.

that the same analysis would extend to the text of the Second Amendment. In *United States v. Verdugo-Urquidez*, the Court held that its analysis of the Constitution "suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 110 S.Ct. 1056, 1061 (1990). Portillo relies on *Verdugo-Urquidez* and argues that he has sufficient connections with the United States to be included in this definition of "the people," but neither this court nor the Supreme Court has held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally.[2]

Moreover, even if there were precedent for the proposition that illegal aliens generally are covered by the Fourth Amendment, we do not find that the use of "the people" in both the Second and the Fourth Amendment mandates a holding that the two amendments cover exactly the same groups of people. The purposes of the Second and the Fourth Amendment are different. The Second Amendment grants an affirmative right to keep and bear arms, while the Fourth Amendment is at its core a protective right against abuses by the government.

---

[2]Portillo cites to this court's decision in *Martinez-Aguero v. Gonzalez* as holding that a non-citizen illegally present in the United States was protected by the Fourth Amendment. 459 F.3d 618 (5th Cir. 2006). The alien in that case, Martinez-Aguero, was a Mexican national who visited the United States on a monthly basis using a visitor's visa. Prior to the incident at issue in the case, during which she was subjected to excessive force by a border-patrol agent, Martinez-Aguero had applied for an updated visa and was incorrectly told by United States immigration officials that she could use her old card in the interim period. The court did not implicitly or explicitly hold that illegal aliens as a class are covered by the Fourth Amendment, and the facts of the case are so very dissimilar from those in Portillo's case that we do not find the court's decision especially persuasive here.

Attempts to *precisely* analogize the scope of these two amendments is misguided, and we find it reasonable that an affirmative right would be extended to fewer groups than would a protective right. The Second Circuit laid out compelling reasons for why an illegal alien could not claim that a predecessor statute to section 922(g)(5) violated the Fifth Amendment right to equal protection by saying that "illegal aliens are those who . . . are likely to maintain no permanent address in this country, elude detection through an assumed identity, and – already living outside the law – resort to illegal activities to maintain a livelihood." *United States v. Toner*, 728 F.2d 115, 128-29 (2d Cir. 1984). The court went on to approvingly quote the district court's statement that "one seeking to arrange an assassination would be especially eager to hire someone who had little commitment to this nation's political institutions and who could disappear afterwards without a trace . . ." *Id.* at 129 (internal quotation marks omitted).

Additionally, the Supreme Court has long held that Congress has the authority to make laws governing the conduct of aliens that would be unconstitutional if made to apply to citizens. In *Matthews v. Diaz*, the appellees were lawful resident aliens challenging a federal law that limited eligibility to Medicare Part B to aliens who had been admitted for permanent residence and had also resided in the United States for at least five years. 96 S.Ct. 1883 (1976). The Supreme Court upheld both conditions as constitutional against a challenge under the Due Process Clause. The Court pointed out in its opinion that the crucial question was whether discrimination among different types of aliens was permissible, as contrasted with discrimination between aliens and citizens and held that "[n]either the overnight visitor, the unfriendly agent of a

hostile foreign power, the resident diplomat, nor the illegal entrant, can advance even a colorable constitutional claim to a share in the bounty that a conscientious sovereign makes available to its own citizens and *some* of its guests." *Id.* at 1891 (emphasis in original). The Court went on to say that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.*

The Court, in several cases striking down state laws restricting otherwise lawful activities in which aliens could engage, has emphasized that the rights thus protected were those of aliens who were *lawful* inhabitants of the states in question. In 1915, the Supreme Court held in *Truax v. Raich* that the complainant, a native of Austria admitted for residency in the United States, was entitled to equal protection under the 14th Amendment because he was "lawfully an inhabitant of Arizona." 36 S.Ct. 7, 9 (1915). *See also id.* at 10 (states cannot "deny to lawful inhabitants . . . the ordinary means of earning a livelihood."). *See also Kwong Hai Chew v. Colding*, 73 S.Ct. 472, 477 & n.5 (1953); *Torao Takahashi v. Fish and Game Comm'n*, 68 S.Ct. 1138, 1142, 1143 (1948). This court noted in *Lynch v. Cannatella* that "the Constitution does not forbid all differences in governmental treatment between citizens and aliens, or between aliens who have been legally admitted to the United States and those who are present illegally." 810 F.2d 1363, 1373 (5th Cir. 1987).

The courts have made clear that the Constitution does not prohibit Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens. We find that analysis persuasive in interpreting the text of the Second Amendment. Whatever else the term means or includes, the phrase "the people" in the Second Amendment of the

Constitution does not include aliens illegally in the United States such as Portillo, and we hold that section 922(g)(5) is constitutional under the Second Amendment.[3]

## II.

### Due Process Violation

Portillo argues that 18 U.S.C. § 922(g)(5) violates his Fifth Amendment due process rights, both on its face and as applied. We hold that Portillo waived the right to challenge the constitutionality of the statute on Fifth Amendment grounds. Portillo's conditional guilty plea explicitly says that Portillo is entitled to appeal the denial of his motion to dismiss "only as it relates to whether the statute in question 18 U.S.C. § 922(g)(5), violates the defendant's Second Amendment right to keep and bear arms and to self-defense." At Portillo's rearraignment hearing, the court again said that Portillo was reserving his right to appeal the order denying his motion to dismiss "as it relates to the statute in question, that is, 18 U.S.C. § 922(g)(5), in which you contend that the statute violates your Second Amendment right to keep and bear arms and to self defense." We hold that the text of the conditional guilty plea only reserves Portillo's right to appeal on the grounds that the statute violates the Second Amendment, thus we do not reach the merits of whether Portillo's due process rights were violated.[4]

---

[3]This case does not involve, and we do not speak to, the constitutional trial, personal bodily integrity, privacy or speech rights of illegal aliens; we speak only to whether the Second Amendment precludes Congress from limiting the actual, affirmative conduct of aliens while they are illegally present within this country. This is a pure question of law which the district court has correctly answered.

[4]If we were to reach the merits of Portillo's due process claim, we would find his arguments wholly unconvincing. The statute in question is a federal law, not a state law,

**CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's denial of Portillo's motion to dismiss.

AFFIRMED

---

and thus the Bill of Rights applies directly to the statute without need for incorporation. Since the Second Amendment explicitly provides for a constitutional right to bear arms, Portillo cannot look to the due process clause as an additional source of protection for a right to keep and bear arms. *See Graham v. Connor*, 109 S.Ct. 1865, 1871 (1989).

DENNIS, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's dismissal of the Fifth Amendment claim in this case, because I agree that the defendant, Armando Portillo-Munoz, waived his right to argue that 18 U.S.C. § 922(g)(5) violates his Fifth Amendment due process rights.

However, I respectfully dissent from the majority's dismissal of Portillo-Munoz's Second Amendment claim. The majority concludes that Portillo-Munoz, a ranch hand who has lived and worked in the United States for more than 18 months, paid rent, and helped supported a family — but who committed the misdemeanor of illegally crossing the border — is not part of "the people." Supreme Court and Fifth Circuit precedent recognize that the phrase "the people" has the same meaning in the First,[1] Second,[2] and Fourth[3] Amendments. The majority's determination that Portillo-Munoz is not part of "the people" effectively means that millions of similarly situated residents of the United States are "non-persons" who have no rights to be free from unjustified searches of their homes and bodies and other abuses, nor to

---

[1]The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of *the people* peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I (emphasis added).

[2]The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of *the people* to keep and bear Arms, shall not be infringed." U.S. Const. amend. II (emphasis added).

[3]The Fourth Amendment states: "The right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added).

peaceably assemble or petition the government.  In my view, Portillo-Munoz clearly satisfies the criteria given by the Supreme Court and our court for determining whether he is part of "the people": he has come to the United States voluntarily and accepted some societal obligations.  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) ("[A]liens with substantial connections are those who are in this country 'voluntarily and presumably [have] accepted some societal obligations.'" (second alteration in original) (quoting *Verdugo-Urquidez*, 494 U.S. at 273).

Of course, whether 18 U.S.C. § 922(g)(5) violates the Second Amendment is a separate question from whether Portillo-Munoz is part of "the people" who have First, Second, and Fourth Amendment rights.  I would remand for the district court to consider in the first instance the applicable level of scrutiny under the Second Amendment, and whether the provision passes muster under that level of scrutiny.[4]

---

[4]Since *District of Columbia v. Heller*, 554 U.S. 570 (2008), courts of appeal have taken various approaches to scrutinizing laws regarding firearms.  *See, e.g., Nordyke v. King*, No. 07-15763, 2011 WL 1632063, at *5 (9th Cir. May 2, 2011) (applying a "substantial burden" test to determine whether to apply heightened scrutiny to county ordinance); *United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010) (applying intermediate scrutiny to review of § 922(g)(9)); *United States v. Reese*, 627 F.3d 792, 801-02 (10th Cir. 2010) (applying intermediate scrutiny to review of § 922(g)(8)); *United States v. Williams*, 616 F.3d 685, 692-94 (7th Cir. 2010) (applying intermediate scrutiny to review of § 922(g)(1)); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc) (declining to label the level of scrutiny being applied, but upholding § 922(g)(9) because "logic and data establish a substantial relation between" the subsection and an "important governmental objective"); *United States v. Marzzarella*, 614 F.3d 85, 96-98 (3d Cir. 2010) (applying a sliding scale test to determine the appropriate level of scrutiny for evaluating § 922(k)).

11

**A.**

The majority's interpretation of the "the people" has far-reaching consequences: as the Supreme Court recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Verdugo-Urquidez*, the same set of "people" protected by the Second Amendment are also protected by the First and Fourth Amendments. *See Heller*, 554 U.S. at 580 (explaining that "'the people' seems to have been a term of art employed in select parts of the Constitution," and that the phrase refers to those who are "protected by the Fourth Amendment, and by the First and Second Amendments." (quoting *Verdugo-Urquidez*, 494 U.S. at 265) (quotation marks omitted)). Indeed, the author of today's majority opinion recognized as much in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001). In *Emerson*, this court concluded, as the Supreme Court would, several years later in *Heller*, that the Second Amendment confers an individual rather than collective or quasi-collective right to bear arms. 270 F.3d at 260. One of the rationales the *Emerson* court gave for adopting the "individual rights model" was that "[i]t gives the same meaning to the words 'the people' as used in the Second Amendment phrase 'the right of the people' as when used in the exact same phrase in the contemporaneously submitted and ratified First and Fourth Amendments." *Id.* at 227. The court further explained:

> There is no evidence in the text of the Second Amendment, or any
> other part of the Constitution, that the words "the people" have a
> different connotation within the Second Amendment than when
> employed elsewhere in the Constitution. In fact, the text of the
> Constitution, as a whole, strongly suggests that the words "the
> people" have precisely the same meaning within the Second

12

Amendment as without.

*Id.* at 227-28.

In view of these precedents, I find the majority's attempt, in dicta, to limit its reasoning to the Second Amendment context to be unconvincing. The majority labels the Second Amendment an "affirmative right" and the Fourth Amendment a "protective right." Maj. Op. 5. This distinction, unfortunately, is unpersuasive. The majority's characterization of the Second Amendment as an affirmative right is contradicted by *Heller*: "[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" 554 U.S. at 592. Both the Second and Fourth Amendments plainly refer to the right of "the people" to be free from unwarranted governmental intrusion — whether in the form of unreasonable searches or seizures, or in the form of infringements on the right to bear arms. *See* U.S. Const. amend. II (stating that "the right of the people to keep and bear Arms *shall not be infringed*" (emphasis added)); U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, *shall not be violated*, and no Warrants shall issue, but upon probable cause . . . ." (emphasis added)). Moreover, the majority's reasoning implicates not only the Fourth Amendment, but also the First Amendment, which similarly prohibits Congress from "*abridging* . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I (emphasis added).

13

There are countless persons throughout Texas, Louisiana, and Mississippi, who, like Portillo-Munoz, work for employers, pay rent to landlords, and support their loved ones, but are unlawfully residing in the United States.  The majority's reasoning renders them vulnerable — to governmental intrusions on their homes and persons, as well as interference with their rights to assemble and petition the government for redress of grievances — with no recourse.

The majority's categorical conclusion that persons like Portillo-Munoz are not part of "the people" is also incongruous with the holding of the Supreme Court in *Plyler v. Doe*, 457 U.S. 202 (1982): "Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term.  Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Id.* at 210 (citing cases).  It would be strange for the same founders who contemporaneously adopted the First, Second, Fourth, and Fifth[5] Amendments to have intended for the Fifth Amendment to cover a different class of persons than the other three amendments, considering that "people" is merely the plural of "person."

**B.**

The sole basis for the majority's conclusion that Portillo-Munoz should not be considered part of "the people" is that he is unlawfully present in the United States.  However, this rationale is wholly unsupported by the applicable precedents.

As the majority acknowledges, *Heller* did not address the question of

---

[5]The Fifth Amendment states in relevant part: "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

whether noncitizens, lawfully or unlawfully present in the United States, have Second Amendment rights.  Importantly, in both *Heller* and *Verdugo-Urquidez*, a Fourth Amendment case, the Supreme Court indicated that "the people" includes people who have developed "sufficient connection" with the United States.  The *Heller* Court, reiterating the analysis given in *Verdugo-Urquidez*, explained:

> "[T]he people" seems to have been a term of art employed in select parts of the Constitution. . . . [Its uses] sugges[t] that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community *or who have otherwise developed sufficient connection with this country to be considered part of that community.*

*Heller*, 554 U.S. at 580 (alterations in original) (emphasis added) (quoting *Verdugo-Urquidez*, 494 U.S. at 265) (quotation marks omitted); *see also Verdugo-Urquidez*, 494 U.S. at 271 ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country").  In *Verdugo-Urquidez*, the Court reasoned that an alien establishes substantial connections with this country when she or he (1) is voluntarily present in the United States and (2) "accept[s] some societal obligations."  494 U.S. at 273; *see also Martinez-Aguero*, 459 F.3d at 625 ("[A]liens with substantial connections are those who are in this country 'voluntarily and presumably [have] accepted some societal obligations.'" (second alteration in original)

15

(quoting *Verdugo-Urquidez*, 494 U.S. at 273).[6]

In *Verdugo-Urquidez*, the Supreme Court concluded that an alien who was brought to the United States against his will, for the sole purpose of subjecting him to a criminal prosecution, was not entitled to Fourth Amendment protections because he "had no voluntary connection with this country that might place him among 'the people' of the United States," and thus that the warrantless search of his properties by United States government agents in Mexico did not violate the Fourth Amendment.  494 U.S. at 273.  Nothing in *Verdugo-Urquidez* requires that the alien must be lawfully present in the United States in order to establish substantial connections.  In fact, the Court expressly assumed for the sake of argument that aliens who are unlawfully present in the United States are protected by the Fourth Amendment.  *Id.* (declining to decide the issue because "such a

---

[6]Although he joined and provided the fifth vote for the majority opinion in *Verdugo-Urquidez*, Justice Kennedy also appeared to depart from its reasoning regarding the substantial connections test, explaining:

> I cannot place any weight on the reference to "the people" in the Fourth Amendment as a source of restricting its protections. With respect, I submit these words do not detract from its force or its reach. Given the history of our Nation's concern over warrantless and unreasonable searches, explicit recognition of "the right of the people" to Fourth Amendment protection may be interpreted to underscore the importance of the right, rather than to restrict the category of persons who may assert it.

494 U.S. at 276 (Kennedy, J., concurring).  Rather, "Justice Kennedy appeared to indicate that the key factor in his decision was the extraterritorial application of the Fourth Amendment: 'If the search had occurred in a residence within the United States, I have little doubt that the full protections of the Fourth Amendment would apply.'" *Martinez-Aguero*, 459 F.3d at 624 (quoting *Verdugo-Urquidez*, 494 U.S. at 278).  Our court, in *Martinez-Aguero,* declined to decide whether the substantial connections test was controlling, because it determined that the alien satisfied the test, which was "more demanding" than any other potentially applicable test.  *Id.* at 625.  Likewise, in this case, for the reasons given below, Portillo-Munoz has also shown that he has substantial connections with this country.

16

claim [was not] squarely before us," but explaining that "assuming that [illegal] aliens would be entitled to Fourth Amendment protections," such aliens would be different from the alien in *Verdugo-Urquidez*, provided that they "were in the United States voluntarily and presumably had accepted some societal obligations"). The Court also suggested that if the alien's presence in the country, even if involuntary, had been "prolonged" for more than "a matter of days" when the search occurred, he could perhaps have been eligible to "claim the protection of the Fourth Amendment." *Id.* at 272.

In *Martinez-Aguero*, this court held that an alien who attempted to enter the United States in an unlawful manner was part of "the people" under the purposes of the Fourth Amendment. 459 F.3d at 625. The alien, who did not reside in the United States but regularly crossed the border to visit family, attempted to enter with an expired visa, which American consular officials had incorrectly told her would suffice for her border crossings. *Id.* at 620. This court held that the alien's "regular and lawful entry of the United States pursuant to a valid border-crossing card and her acquiescence in the U.S. system of immigration constitute her voluntary acceptance of societal obligations." *Id.* at 625 (footnote omitted). The *Martinez-Aguero* court never indicated that attempting to comply with United States immigration laws is the only way that an alien can accept some societal obligations. On the contrary, the opinion suggested that the standard for establishing substantial connections is not high and that there would be few, if any, cases where an alien who was voluntarily within the United States would be unable to establish such connections. *Id.* ("There *may be* cases in which an alien's connection with the United States is *so tenuous* that he cannot reasonably expect the protection of its constitutional guarantees . . . ." (emphases

17

added)).

In the present case, Portillo-Munoz plainly satisfies both criteria of the substantial connections test under *Verdugo-Urquidez* and *Martinez-Aguero*: he is voluntarily present in the United States and has accepted several societal obligations.  First, Portillo-Munoz came to and remained in the United States of his own volition.  By contrast, in *Verdugo-Urquidez*, the Court concluded that the alien was not voluntarily present in the United States, because he had been brought to the country by the United States Marshals.  494 U.S. at 273.

Portillo-Munoz has also accepted several societal obligations, a fact that is uncontested by the government.  First, Portillo-Munoz has accepted and fulfilled obligations to his American employers.  At the time of his arrest, he had been working a steady job for six months, as a ranch hand in Dimmitt, Texas, where he was responsible for planting and harvesting crops, as well as raising chickens.  Portillo-Munoz obtained his firearm in order to protect his employer's chickens from coyotes.  Prior to his employment at the ranch, Portillo-Munoz worked at a dairy farm in Hereford, Texas, where he fed cattle and ensured that their feed was properly stored.  Second, Portillo-Munoz accepted and fulfilled obligations to his landlord by paying rent for his home.  Third, he accepted and fulfilled obligations to his girlfriend and her daughter by helping to financially support them.  Finally, aside from unlawfully entering the United States (a misdemeanor punishable by fine or imprisonment of up to six months, 8 U.S.C. § 1325(a)), Portillo-Munoz has no criminal record or history of arrests.  Many United States citizens have committed far more serious crimes, yet they still receive the constitutional

18

protections given to "the people."[7]

Moreover, Portillo-Munoz's place in United States society resembles that of many others.  The Supreme Court recognized in *Plyler* that millions of aliens who are unlawfully present in the United States are part of American society: "The Attorney General [William French Smith, who served under President Ronald Reagan] recently estimated the number of illegal aliens within the United States at between 3 and 6 million. . . . [T]he Attorney General noted that this subclass is largely composed of persons with a permanent attachment to the nation . . . . [describing them as] 'millions of illegal aliens, many of whom have become, in effect, members of the community.'"  457 U.S. at 219 n.17 (quoting J. Hearing before the Subcomm. on Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary and the Subcomm. on Immigration and Refugee Policy of the S. Comm. on the Judiciary, 97th Cong., 1st Sess., 9 (1981) (testimony of William French Smith)).

If an alien who undertook "periodic visits [to the United States] to assist her aunt with retrieving her Social Security check" has substantial connections to this country, *Martinez-Aguero*, 459 F.3d at 625, then surely Portillo-Munoz does, as well.  He has voluntarily come to the United States and resided here for over 18 months, developing substantial connections with this country by fulfilling societal obligations to his employers, his landlord,

---

[7] *See, e.g., Dawson v. Delaware*, 503 U.S. 159, 167 (1992) (holding that the "First Amendment rights" of a defendant, who had convicted of murder, "were violated by the admission [in the sentencing phase] of [evidence of his membership in] the Aryan Brotherhood . . . because the evidence proved nothing more than [the defendant's] abstract beliefs"); *United States v. Webster*, 162 F.3d 308, 333 (5th Cir. 1998) ("[The defendant's] experience in police procedure, resulting from his lengthy criminal record, belies the assertion that he was unaware of his [Fourth Amendment] rights . . . .").

his girlfriend and her daughter.  He is "in effect, [a] member[] of the community" like the aliens described in *Plyler*.  457 U.S. at 219 n.17. Therefore, he is part of "the people," and is entitled to the protections of the Bill of Rights, including not only the Second Amendment, but also the First and Fourth Amendments.

## C.

Finally, the majority cites a number of cases that are inapposite to the question presented in this case: whether Portillo-Munoz is part of "the people."  The majority reasons that the cases it cites support the proposition "that the Constitution does not prohibit Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens."  Maj. Op. 7.  Those cases may be relevant to whether 18 U.S.C. § 922(g)(5) violates the Second Amendment.  This dissent does not discuss that question, because, as explained above, I would remand for the district court to answer it in the first instance.

However, that is a distinct issue from the question which the majority purports to answer, and which accordingly is the focus of this dissent: whether aliens such as Portillo-Munoz are part of "the people," and have any rights at all, under the First, Second, and Fourth Amendments.  Because Portillo-Munoz has substantial connections with this country, and because the majority's holding effectively nullifies the rights of countless others like him, I dissent from the majority's dismissal of Portillo-Munoz's Second Amendment claim.