**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 25, 2011

No. 10-20725
Summary Calendar

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

ADNAN MIRZA,

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:06-cr-00421-2

Before BENAVIDES, STEWART, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Adnan Mirza was convicted by a jury of various counts of possessing weapons and ammunition while being unlawfully in the United States. In addition, he was convicted of conspiring to contribute funds to the Taliban. On appeal, Mirza raises numerous arguments challenging his convictions. We affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-20725

## I.

Mirza, a citizen of Pakistan, arrived in the United States on August 24, 2001 on a student visa. After arriving, he enrolled at Houston Community College. Later that year, Mirza met James Coates and Kobie Williams at a meeting of a local Muslim group.

In 2004, Coates was interviewed by Customs and Border Control officials after he and Williams were stopped at Big Ben National Park in an automobile containing weapons. After receiving a phone call from these officials, the FBI proceeded to interview Coates. Based on this interview, the FBI opened an investigation targeting Mirza and Williams. This investigation was assigned to John McKinley. According to McKinley, the goal of this investigation was to "determine Mr. Mirza's and Mr. Williams' intent based on the information [the FBI] received and then try to substantiate those allegations."

In September 2005, Coates introduced an undercover agent named Malik Mohammad to Mirza. Mohammad then became part of a "jamaat," or group, that included Mirza, Williams, and Coates. Mohammad's role within the group was to teach "hand-to-hand tactics." According to Mohammad, the intent of the group was to "go through Pakistan to eventually get into Afghanistan and/or Iraq." At trial, Mohammad also testified that the group was "trying to go and hook up with, essentially, anybody fighting against the Americans, but that entailed the Mujahadeen, the Taliban, al-Qaeda."

In preparation for its intended trip overseas, the group trained at a "camp" in Willis, Texas. On September 16, 2005, Mohammad participated in his first training camp with the group. During these camps, the group would shoot weapons and engage in military-type tactical training. Photographs presented at trial showed Mirza shooting targets shaped as human silhouettes. Mohammad testified that he also participated in two other training camps with the group. Along with these training camps, the group also went to a shooting

2

range on two occasions. At trial, Mohammad stated that "all these things [the group was] doing [was] for the purpose of the jamaat as a group, and it was for the end goal of us being able to go over to the Middle East and fight against the American Coalition."[1]

In addition to training, the group also discussed getting money "to the people fighting." According to Mohammad, the group was trying to get money to Afghanistan and, specifically, to the Mujahadeen groups and the Taliban. Because of the difficulties in getting money to the fighters in Afghanistan, the group discussed an alternative route, which consisted of sending the money to the fighters' families in Pakistan. The group also discussed funneling the money to the "people on the battlefields" through a doctor working at a hospital in the region. Mohammad testified at trial that the group's goal was "to support the people fighting against the American forces the best we could–whatever path that took." To achieve the group's objective, Mirza took money from Coates and Williams and gave it to another individual with the intent that the money go to support the families of the Taliban or Mujahadeen fighters in Afghanistan.

After Williams informed Mirza that the FBI was interested in talking to him, Mirza met with FBI agents on November 8, 2006. According to McKinley, who was one of the agents at the meeting, Mirza told them about the training camps and what the group did during these camps. McKinley also testified that Mirza told him that the group's plan was "to travel to Afghanistan, figure out which side was right and then join that side and assist them militarily." During this meeting, Mirza also indicated that it was his intent to send money to the families of the fighters. Notably, when asked whether he was employed, Mirza stated that he was working. Later this same day, Mirza met up with McKinley and another FBI agent to turn over a shotgun he possessed.

---

[1] The government also established that Mirza purchased approximately one thousand rounds of .223-caliber ammunition at a gun show on December 31, 2005.

No. 10-20725

Based on information she received from the FBI indicating that Mirza was working, Jessica Gilbeau, an Immigration and Customs Enforcement agent, visited Mirza at a Houston business on November 22, 2006. At trial, Gilbeau testified that Mirza admitted to being employed and earning $870 monthly consolidating data for oil companies. In addition, during this interview Mirza stated that he had been working for a year and a half. Because he was employed without permission from the Department of Homeland Security, Gilbeau testified that Mirza had violated the terms of his student visa. According to Gilbeau, this violation established that Mirza was unlawfully present in the United States since May 2005. Six days later, Mirza was taken into custody.

On August 19, 2009, the government filed a superseding nine count indictment against Mirza. The indictment charged Mirza with the following: (1) conspiring to unlawfully possess one thousand rounds of ammunition and five firearms while he was unlawfully present in the United States, in violation of 18 U.S.C. §§ 371 and 922(g)(5)(A) (Count 1); conspiring to contribute funds to the Taliban, in violation of 18 U.S.C. § 371 and 50 U.S.C. § 1705 (Count 2); possessing firearms while he was unlawfully present in the United States, in violation of 18 U.S.C. § 922(g)(5)(A) (Counts 3, 5-9); and possessing ammunition while he was unlawfully present in the United States, in violation of 18 U.S.C. § 922(g)(5)(A) (Count 4).

Mirza's four-day trial began on May 24, 2010.[2] At the beginning of the second day of trial, Mirza, during the government's case-in-chief, moved under Federal Rule of Criminal Procedure 29 to dismiss Count 2. According to Mirza, the testimony presented on the first day of trial failed to establish that he intended to support the Taliban. On the third day of trial, Mirza moved for a judgment of acquittal on all counts in the indictment after the government

---

[2] At trial, the government introduced various audio recordings of conversations involving Mirza.

rested.  The district court denied both motions.  On May 27, 2010, the jury convicted Mirza on all counts.  The district court subsequently sentenced Mirza to 180 months imprisonment and three years supervised release.  Mirza filed a timely notice of appeal.

## II.

Mirza presents numerous arguments attacking his convictions.  After addressing his challenges to his Count 2 conviction, we will proceed to consider Mirza's arguments with respect to his weapons and ammunition convictions.

### A.

Mirza contends that there are three grounds for reversing his Count 2 conviction.  We consider each argument in turn.

#### 1.

He begins his attack on this conviction by challenging the sufficiency of the evidence.  "A challenge to the sufficiency of the evidence that is procedurally preserved, as this challenge was, is reviewed *de novo*."[3]  *United States v. Diaz*, 646 F.3d 328, 340 (5th Cir. 2011) (citation omitted).  Under this standard of review, we must "determine whether . . . a rational jury could have found the essential elements of the offense beyond a reasonable doubt.  We are concerned only with whether the jury made a rational decision, not with whether its verdict was correct on the issue of guilt or innocence."  *United States v. Alarcon*, 261 F.3d 416, 421 (5th Cir. 2001) (internal quotation marks and citations omitted).

---

[3]  Although we apply a *de novo* standard of review, we note that the record does not reflect that Mirza moved for a judgment of acquittal after presenting his case.  As we have stated before, "[w]here a defendant moves for a judgment of acquittal after the government rests but fails to renew the motion after presenting his case, this failure to renew the motion generally constitutes a waiver, and our review of his sufficiency of the evidence claim is normally limited to whether there was a manifest miscarriage of justice."  *United States v. Resio-Trejo*, 45 F.3d 907, 910 n.6 (5th Cir. 1995).  Because the transcript cuts off portions of the proceedings after the conclusion of Mirza's case, we are not certain that he failed to preserve this challenge.  Given the ultimate futility of this challenge even under the *de novo* standard of review, we will consider this challenge procedurally preserved.

No. 10-20725

In making this determination, we review the evidence, both direct and circumstantial, in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction. *United States v. Anderson*, 559 F.3d 348, 353 (5th Cir. 2009); *United States v. Miller*, 146 F.3d 274, 280 (5th Cir. 1998). If the evidence would permit a rational fact finder to find every element of the offense beyond a reasonable doubt, we must affirm. *Id.*

The International Emergency Economic Powers Act ("IEEPA"), which was enacted in 1977 and is codified at 50 U.S.C. § 1701 *et seq.*, gives the President certain powers to "deal with any unusual and extraordinary threat . . . to the national security, foreign policy or economy of the United States" that "has its source in whole or substantial part outside the United States[.]" 50 U.S.C. § 1701(a). If the President declares a national emergency with respect to such a threat, he may "under such regulations as he may prescribe, by means of instructions, licenses, or otherwise," regulate certain types of economic activity. *Id.* § 1702(a).

In the wake of the September 11 attacks, President George W. Bush issued Executive Order 13,224, which blocked the property of certain groups and individuals. *See* Exec. Order. No. 13,224, 66 Fed. Reg. 49079 (Sept. 23, 2001). This Executive Order also provided the following: "any transaction or dealing . . . in property or interests in property blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons listed in the Annex to this order or determined to be subject to this order[.]" *Id.* Although not originally listed, the Taliban was added to the Annex on July 2, 2002. *See* Exec. Order. No. 13,268, 67 Fed. Reg. 44751 (July 2, 2002). Pursuant to 50 U.S.C. § 1705(a), it is unlawful for a person to conspire to violate any order issued under the IEEPA.

6

No. 10-20725

In Count 2 of the indictment, the government alleged that Mirza conspired "along with others known and unknown to the Grand Jury" to "willfully and unlawfully make a contribution of funds . . . to and for the benefit of the Taliban." Mirza challenges his Count 2 conviction on the grounds that there was "no evidence whatsoever that [Mirza] aided [the] Taliban." We are unpersuaded by his argument.

As a threshold matter, we note that contrary to what Mirza suggests, he was not charged with aiding the Taliban. Rather, the indictment charged him with conspiring to contribute funds to benefit the Taliban. Once his charge is properly characterized, it is clear that the evidence presented at trial was enough for a rational jury to have found Mirza guilty of conspiring to contribute funds to benefit the Taliban.

It is well-established that "[c]onspiracy is characterized by an agreement between two or more people for the purposes of promoting or committing a crime." *United States v. Mendez-Casarez*, 624 F.3d 233, 240 (5th Cir. 2010) (internal quotation marks and citation omitted). "Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975). The agreement necessary to convict a defendant of conspiracy "need not be shown to have been explicit. It can instead be inferred from the facts and circumstances of the case." *Id.* at 777 n.10.

To be clear, Mirza could not have entered into a conspiratorial agreement to contribute funds to benefit the Taliban with either Mohammad or Coates. *See Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965) (holding that there "can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy"); *United States v. Corson*, 579 F.3d 804 (7th Cir. 2009) ("A defendant is not liable for conspiring solely with an undercover agent or a government informant."). Rather, based on the evidence presented at trial and

the reasonable inferences that can be drawn from that evidence, a rational jury could have found that Mirza entered into such an agreement with either Williams or the individual Mirza used to get money to the families of the Taliban or Mujahadeen fighters in Afghanistan.  For example, the inferences that can be drawn from McKinley's testimony, combined with audio tapes presented at trial and the accompanying testimony from Mohammad, provided a rational jury with a sufficient evidentiary basis to conclude that Mirza had an agreement with Ayub Adat, the individual who received $1,000 from Mirza to send overseas to the families of the fighters.  Given this conclusion, we determine that there was sufficient evidence to support Mirza's IEEPA conviction.

**2.**

Next, Mirza contends that his Count 2 conviction is invalid because the statute upon which it was predicated is unconstitutional.  Specifically, he argues that the IEEPA is an unconstitutional delegation of legislative authority to the President.  "A constitutional challenge to a federal statute is a question of law that this court reviews *de novo.*"  *United States v. Palazzo*, 558 F.3d 400, 403-04 (5th Cir. 2009) (citation omitted).

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. I, § 1.  "From this language the Supreme Court has derived the nondelegation doctrine: that Congress may not constitutionally delegate its legislative power to another branch of Government."  *Touby v. United States*, 500 U.S. 160, 165 (1991).  "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government."  *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

The Supreme Court has "long recognized that the nondelegation doctrine does not prevent Congress from seeking assistance, within proper limits, from its coordinate Branches."  *Touby*, 500 U.S. at 165 (citation omitted).  "Thus,

No. 10-20725

Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Id.* "So long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'"[4] *Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

In applying this "intelligible principle" test to congressional delegations, the Supreme Court's jurisprudence has been "driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372 (citations omitted). "The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function." *Id.* (citation omitted). Accordingly, the Supreme Court "has deemed it 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'" *Id.* at 372-73 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).[5]

Three circuits have rejected nondelegation challenges to the IEEPA's delegation of authority to the Executive branch to criminalize certain conduct.

---

[4] The Supreme Court has expressly refrained from deciding whether Congress must provide more specific guidance than a mere "intelligible principle" when authorizing the Executive "to promulgate regulations that contemplate criminal sanctions." *Touby*, 500 U.S. at 165-66. Mirza has not raised this issue, so we need not decide this question. *United States v. Valdiosera*, 932 F.2d 1093, 1099 (5th Cir. 1991) (applying the rule that "any issue not raised or argued in the appellant's brief are considered waived and will not be entertained on appeal").

[5] Notably, the Supreme Court has used the nondelegation doctrine to strike down a federal law only twice in its history. *See Pan. Ref. Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).

9

*See United States v. Amirnazmi*, 645 F.3d 564, 575-77 (3d Cir. 2011); *United States v. Dhafir*, 461 F.3d 211, 215-17 (2d Cir. 2006); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092-94 (4th Cir. 1993).  Because the IEEPA sets forth an "intelligible principle" along with several other limitations on the President's exercise of power, we follow suit.

After considering the Supreme Court's nondelegation jurisprudence, we conclude that the IEEPA contains an "intelligible principle" that constrains the exercise of power delegated to the Executive branch.  The statutory language stating that "[a]ny authority granted to the President by section 1702 . . . may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial party outside the United States" is enough to satisfy the "intelligible principle" requirement.  *Cf. Touby*, 500 U.S. at 165 (holding that a statute's "imminent hazard to the public safety" standard was an "intelligible principle").

Not only does the IEEPA contain an "intelligible principle," but it also has several other limitations on the President's power.  First, the authorities delegated to the President are explicitly defined and limited.  *See* 50 U.S.C. § 1702.  Second, the President is to, if possible, consult with Congress before exercising the power conferred by the IEEPA.  *Id.* § 1703(a).  Moreover, whenever the President exercises any of the powers granted by the IEEPA, he is required to immediately transmit to Congress a report specifying, *inter alia*, "the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal" with the unusual and extraordinary threats which triggered the national emergency.  *Id.* § 1703(b).  This reporting requirement is subject to periodic follow-up reports to Congress.  *Id.* § 1703(c).  Third, the power granted to the President by the IEEPA can be eliminated by Congress's termination of the declaration of emergency.  *See id.* §§ 1701(b), 1706.  These limitations, combined with the "intelligible principle" set forth in the statute,

No. 10-20725

establish that the IEEPA is not an unconstitutional delegation of legislative power.  Mirza's attempt to undermine his conviction on nondelegation grounds is therefore unsuccessful.

**3.**

Mirza also argues that his IEEPA conviction violates the Due Process Clause. Specifically, he contends that the term "Taliban" is impermissibly vague under the Due Process Clause of the Fifth Amendment.[6]  "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2718 (2010) (citation omitted).  "We consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Id.* at 2718-19.

According to Mirza, he lacked notice of which "foreign nationals were subject to economic prohibitions under [the] IEEPA."  Moreover, he maintains that term "Taliban" is vague because "for many people throughout the planet" the term "Taliban" means "students."  We reject both assertions.  Our inquiry is focused on whether a person of ordinary intelligence would have fair notice of what is prohibited.[7]  Given the ten years that have passed since the Taliban

---

[6]  Mirza also presents three other Due Process deficiencies with his Count 2 conviction. Because these arguments are presented in a conclusory fashion, we will not consider them. *E.g., United States v. Stalnaker.* 571 F.3d 428, 440-41 (5th Cir. 2009) (concluding that undeveloped arguments that lacked citations to relevant law were waived for inadequate briefing).  While Mirza does cite case law for two propositions, the cases he relies upon are either inapposite or have been expressly rejected by this court.

[7]  Mirza does not argue that the statute is "is so standardless that it authorizes or encourages seriously discriminatory enforcement."  His contention focuses on a lack of notice.

11

entered the public consciousness through the initiation of the war in Afghanistan, we conclude that a person of ordinary intelligence, in the post 9/11 context, would have fair notice of what group the term "Taliban" refers to. Contrary to Mirza's assertion, the meaning a person of ordinary intelligence would assign to the term "Taliban" is certainly not "student." Mirza's vagueness argument therefore falls flat.

**B.**

Mirza also presents several challenges to his weapons and ammunition convictions. We consider each in turn.

**1.**

Mirza contends that his weapons and ammunition convictions should be reversed because the statutory provision upon which they were predicated, 18 U.S.C. §§ 922(g)(5)(A), is unconstitutional. He specifically contends that this provision violates the Second Amendment. We review *de novo* the constitutionality of federal laws. *Anderson*, 559 F.3d at 352.

Section 922(g)(5)(A) provides that "[i]t shall be unlawful for any person . . . who, being an alien . . . illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(5)(A). Earlier this year, we rejected a Second Amendment challenge to this very provision. *See United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011). In doing so, we stated that "[w]hatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States." *Id. Portillo-Munoz* therefore requires us to conclude that the rights conferred by the Second Amendment do not extend to individuals like Mirza who are unlawfully in the United States. Because he does not possess a right to keep and bear arms, he

is foreclosed from arguing that his weapons and ammunition convictions violate his Second Amendment rights.   His Second Amendment challenge to his convictions under Section 922(g)(5)(A) is therefore unavailing.

**2.**

After presenting his Second Amendment challenge, Mirza goes on to argue that his weapons and ammunition convictions violate his "rights to Substantive Due Process, to Procedural Due Process, and to Equal Protection under the Fifth Amendment."   Because he fails to develop any discernible Due Process arguments with respect to these convictions, he has waived any challenge on these grounds.   *E.g., Stalnaker,* 571 F.3d at 440-41.   We will therefore focus our attention on Mirza's argument to the extent it is based on the Equal Protection component of the Fifth Amendment's Due Process Clause. Under this component, Mirza argues that Section 922(g)(5)(A) is unconstitutional because it impermissibly discriminates based on alienage. Again, we review *de novo* the constitutionality of federal statutes. *Anderson*, 559 F.3d at 352.

"We apply the deferential rational basis test to federal statutes that classify based on alienage[.]" *United States v. Santos-Riviera*, 183 F.3d 367, 373 (5th Cir. 1999); *accord Madriz-Alvarado v. Ashcroft*, 383 F.3d 321, 332 (5th Cir. 2004) ("In light of Congress's plenary power to pass legislation concerning the admission or exclusion of aliens, it is clear that no more searching review than that of rational basis is appropriate."). "Under rational basis review, differential treatment 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Madriz-Alvarado*, 383 F.3d at 332 (citation omitted).   In applying rational basis review, we are to presume the constitutionality of the statute, and the burden is on the party attacking the legislative arrangement to

negative every conceivable basis which might support it. *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal quotation marks and citation omitted).

Mirza has not carried his burden of showing that there is not a rational relationship between the challenged classification and some legitimate government purpose. In prohibiting individuals who are unlawfully in the United States from possessing firearms, Congress could have conceivably concluded that a subset of these individuals, like others who have broken the law, *see* 18 U.S.C. § 922(g)(1), may pose a risk to public safety. Admittedly, in seeking to further public safety, Congress used broad generalizations about those who are unlawfully in the United States. Of course, there are many individuals who are unlawfully in this country who pose no risk to public safety. Despite this reality, we "are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller*, 509 U.S. at 321 (internal quotation marks and citation omitted). "'The problems of government are practical ones and may justify, if they do not require, rough accommodations–illogical, it may be, and unscientific.'" *Id.* (quoting *Metropolis Theatre Co. v. Chi.*, 228 U.S. 61, 69-70 (1913)). Accepting Congress's conceivable generalizations, we conclude that there is a rational relationship between Section 922(g)(5)(A) and a legitimate government purpose. Accordingly, we reject this challenge to his weapons and ammunition convictions.[8]

**3.**

_____

[8] Mirza also raises Ex Post Facto and Tenth Amendment challenges to these convictions. Like the various other undeveloped and conclusory arguments that litter his brief, these contentions have been abandoned on appeal. *See Dardar v. Lafourache Realty Co., Inc.*, 985 F.2d 824, 831 (5th Cir. 1993) ("Questions posed for appellate review but inadequately briefed are considered abandoned.") (citations omitted).

Mirza also challenges these convictions on the grounds that they violated his "constitutional right to substantive due process, to procedural due process, and to equal protection to face criminal charges[.]" As the factual basis for these purported constitutional violations, Mirza avers that not only did he fail to receive notice that the government believed he was out of status, but that he was denied the "opportunity to rebut the allegation that he was out of status beginning at a certain point in time." He does not, however, provide any relevant case law to support his argument that the government's inaction or his criminal proceedings violated the Constitution. The only case Mirza cites in this portion of his brief supports the proposition that an individual on a student visa who fails to comply with federal regulations is "'without authorization to remain in this country,' and [is] 'in the same position legally as the alien who . . . enters the United States without permission.'" *United States v. Bazargan*, 992 F.2d 844, 848 (8th Cir. 1993) (quoting *United States v. Igbatayo*, 764 F.2d 1039, 1040 (5th Cir. 1985)). Needless to say, this proposition does not further Mirza's argument. As such, we reject this attempt to undermine his weapons and ammunition convictions.

**4.**

Mirza's three remaining arguments are also futile. First, Mirza contends that his weapons and ammunition convictions are invalid because he did not violate the terms of his student visa. Because this is simply an attempt to revive an argument rejected by the jury, we see no reason to reverse his convictions on this ground.

Second, Mirza asserts that his weapons convictions are invalid because he possessed a valid hunting license. Under 18 U.S.C. § 922(y)(2)(A), Section 922(g)(5)(B) does not apply to "any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is . . . in possession of a hunting license or permit lawfully issued in the United States." Mirza, however,

was not charged with violating Section 922(g)(5)(B). This exception is therefore unavailable to him.

Finally, he contends that the lack of a heightened mens rea requirement for charges brought under Section 922(g)(5)(A) violates the Due Process Clause. Specifically, he contends that a conviction under Section 922(g)(5)(A) should require proof that he knew that it was illegal for him to possess a firearm. In support of this argument, Mirza relies upon the Supreme Court's decision in *Lambert v. California*, 355 U.S. 225 (1957).

In *Lambert*, the petitioner challenged a Los Angeles Municipal Code ordinance that prohibited convicted felons from remaining in the city for longer than five days without registering with the police. Notwithstanding the general rule that ignorance of the law does not excuse illegal behavior, the Supreme Court held that the ordinance gave such insufficient notice that due process was violated. *Lambert*, 355 U.S. at 229-30. Two factors persuaded the Court: (1) the prohibited conduct was "wholly passive"; and (2) there was an absence of "circumstances that should alert the doer to the consequences of his deed." *Id.* at 228. After noting these factors, the Court held that "actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply are necessary before a conviction under the ordinance can stand." *Id.* at 229.

We have previously considered *Lambert*'s applicability in the context of Section 922(g). On each occasion we have encountered this question, we have rejected *Lambert* challenges to convictions under Section 922(g). *E.g., United States v. Shelton*, 325 F.3d 553, 563-64 (5th Cir. 2003) (rejecting *Lambert* challenge to conviction under Section 922(g)(9)); *United States v. Emerson*, 270 F.3d 203, 215-16 (5th Cir. 2001) (rejecting *Lambert* challenge to conviction under Section 922(g)(8)). This occasion will be no different. As we stated in *Shelton*, the *Lambert* due process exception is inapplicable where the conduct involved

is not passive. Here, as in *Shelton*, we conclude that the *Lambert* exception does not apply because possession of a firearm is not a passive activity. *See Shelton*, 325 F.3d at 564. *Lambert* therefore cannot support Mirza's argument.

Mirza's contention that a higher mens rea requirement is necessary under Section 922(g)(5) also fails on a separate ground. 18 U.S.C. § 924(a)(2) provides that the required mens rea under Section 922(g) is knowledge. Contrary to what Mirza suggests, the term "knowingly" as used in the Section 924(a)(2) does not require knowledge that his possession of weapons was illegal. Rather, unless the statute of a language dictates a different result, "the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense," not knowledge of the legal import of those facts. *Bryan v. United States*, 524 U.S. 184, 191-93 (1998); *accord Emerson*, 270 F.3d at 216 ("'Knowingly'–in contrast to at least some uses of 'wilfully'–does not require that the defendant know that his actions are unlawful, but only that he know he is engaging in the activity that the legislature has proscribed."). We therefore reject Mirza's effort to graft a higher mens rea requirement onto Section 922(g)(5).

## III.

For the reasons stated above, we AFFIRM Mirza's convictions.