United States Court of Appeals
Fifth Circuit

**F I L E D**

August 4, 2006

Charles R. Fulbruge III
Clerk

I n the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 05-50472

_____

MARIA ANTONIETA MARTINEZ-AGUERO,

Plaintiff-Appellee,

VERSUS

HUMBERTO GONZALEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

Before SMITH, WIENER, and STEWART,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

We must decide whether aliens stopped at the border have a constitutional right to be free from false imprisonment and the use of excessive force by law enforcement personnel. Concluding that they do, we affirm the denial of Humberto Gonzalez's motion for summary judgment that he pursued on the basis of a claim of qualified immunity, and we remand for further proceedings.

I.

On interlocutory appeal of the denial of a summary judgment motion seeking dismissal for qualified immunity, we review the facts in the light most favorable to the plaintiff. *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004) (en banc) (citing *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000)). Those facts are as follows:

Plaintiff Maria Martinez-Aguero is a forty-nine-year-old citizen and resident of Mexico

who visits the United States once a month to accompany her aunt to the El Paso Social Security office. Though she normally enters the country using a valid border-crossing card (which is the same thing as a visitor visa), her card had become invalid when the former Immigration and Naturalization Service decided to issue biometric, machine-readable cards for increased security. On July 3, 2001, Martinez-Aguero went with her aunt and mother to the U.S. consular office to apply for new cards and asked how she could legally enter the United States while waiting for the cards to arrive in the mail. Officials told her she could get a stamp on her old cards that would allow her to travel in the interim. For the next three months she used the stamped card to cross the border without incident.

On October 4, Martinez-Aguero and her aunt made their usual bus trip to El Paso. United States immigration officials stopped the bus within the zone outside the port of entry but within the territorial United States. Gonzalez, an INS border patrol agent, ordered Martinez-Aguero and her aunt off the bus and requested to see their documents. He told Martinez-Aguero that her visa had expired, so she could not enter the country.

Martinez-Aguero asked to speak to someone in authority, and Gonzalez replied in Spanish, "I am in charge!" Martinez-Aguero asked him why he would not help her, because he also was Mexican. This agitated Gonzalez, who pointed to patches on his uniform and shouted, "Look at me! I am not a Mexican! Look at my uniform!" He then yelled profanities at them in Spanish and threw their visas to the ground.

Martinez-Aguero picked her visa up and made a sarcastic remark to her aunt about Gonzalez's bad language, which he apparently overheard. She and her aunt began walking back in the direction of Mexico when Gonzalez yelled, "Stop in the name of the law!"

Martinez-Aguero alleges in her affidavit that Gonzalez then "grabbed [her] arms, twisted them behind [her] back, pushed her into a concrete barrier, which hit [her] in the stomach . . . [and] then started kicking [her] with his knees in [her] lower back." Another agent then took Martinez-Aguero into an office and handcuffed her to a chair. Gonzalez allegedly came in and showed her scratches on his arms and told her that he was going to claim that she cut him with her fingernails.

Shortly thereafter, Martinez-Aguero, who is epileptic, suffered a seizure while still handcuffed to the chair. She was given oxygen, and when she recovered she was questioned by officials before being permitted to leave. She suffered another seizure after arriving home and was taken to the hospital. She claims she now suffers from recurrent seizures (before the beating she had not suffered a seizure for 17 years), memory problems, back injuries, and continual pain. She alleges she cannot walk long distances or adequately clean her house anymore.

II.

Martinez-Aguero sued Gonzalez for assault, battery, and false arrest under the Federal Tort Claims Act and for false arrest and excessive use of force under the Fourth and Fifth Amendments. Gonzalez moved for summary judgment, asserting qualified immunity. The district court denied the motion, and Gonzalez filed an interlocutory appeal.

### III.

Our standard of review for interlocutory appeals differs from the usual Federal Rule of Civil Procedure 56 standards for summary judgment. We lack jurisdiction to review the district court's finding that no genuine issue of material fact exists; rather, we "consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Kinney*, 367 F.3d at 348. If the interlocutory appeal concerns summary judgment on a defense of qualified immunity, we must view the facts in the light most favorable to the plaintiff. *See id.* (citing *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000)). Our review of the legal significance of the facts is *de novo*. *See id.* at 349.

### IV.

We use a two-part test to determine whether an officer is entitled to qualified immunity: first, do the facts alleged show that he has violated plaintiff's constitutional rights, *see Saucier v. Katz*, 533 U.S. 194, 201 (2001); second, were the rights clearly established at the time of the alleged violation? *See id.* To determine whether a right is clearly established, we ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

The only claims relevant to this appeal are Martinez-Aguero's *Bivens* actions under the Fourth and Fifth Amendments.[1] Specifically, she alleges wrongful arrest under the Fourth Amendment and excessive force under the Fourth and Fifth Amendments. We must determine whether (1) Martinez-Aguero is entitled to the protection of these constitutional guarantees, (2) the facts she alleges would suffice to show that Gonzalez violated her rights, and (3) the rights were clearly established at the time of the incident.

### A.

Gonzalez argues that Martinez-Aguero had no constitutional rights at the time of the alleged incident because she was an alien who attempted to enter the country illegally and was not admitted. Gonzalez relies on *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990), which held that an alien who has no voluntary attachment to the United States enjoys no extraterritorial Fourth Amendment protection.[2] The Court in *Verdugo-Urquidez* analyzed the text and history of the phrase "the People" in the Fourth Amendment and concluded that it "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 265. The Court acknowledged that it had held that aliens enjoy certain constitutional rights, but those cases "establish only that aliens receive constitutional protections when they have

---

[1] "Under *Bivens* a person may sue a federal agent for money damages when the federal agent has allegedly violated that person's constitutional rights." *Brown v. NationsBank Corp.*, 188 F.3d 579, 590 (5th Cir. 1999) (citing *Bivens v. Six Un-* (continued...)

(...continued)
*known Named Agents of Fed. Bur. of Narcotics*, 403 U.S. 388 (1971)). Martinez-Aguero also sued the United States under the Federal Tort Claims Act.

[2] Specifically, the defendant in *Verdugo-Urquidez* was detained in a correctional facility in California while federal agents searched his residence in Mexico without a warrant. *See Verdugo-Urquidez*, 494 U.S. at 262.

come within the territory of the United States and developed substantial connections with the country."[3] Gonzalez also relies on *Johnson v. Eisentrager*, 339 U.S. 763, 765-66 (1950), in which the Court rejected the extraterritorial application of the Fifth Amendment.

The crucial distinction is "that certain constitutional protections available to persons inside the United States are unavailable to aliens outside our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The Court in *Zadvydas* reasoned that a statute that authorized the indefinite detention of removable aliens present in the U.S. would pose serious constitutional problems. *See id.* at 682. The Court distinguished *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), which held that a lawfully admitted alien who left the country and was denied reentry for security reasons could be indefinitely detained at Ellis Island. The "critical" difference for the Court was that the alien in *Mezei* never reentered the United States; "[h]ence, he was treated, for constitutional purposes, as if stopped at the border." *See Zadvydas*, 533 U.S. at 693.[4]

This doctrine is called the "entry fiction," and Gonzalez urges its application to this case: Because Martinez-Aguero was denied entry into the United States, and because the fiction requires us to treat her as if stopped at the border (even though she was technically present in U.S. territory), and because the Fourth and Fifth Amendments have no extraterritorial application, Gonzalez contends he should be entitled to qualified immunity.

We disagree. This conclusion is inconsistent with *Lynch v. Cannatella*, 810 F.2d 1363 (5th Cir. 1987), in which we specifically limited the application of the "entry fiction" to immigration and deportation matters:

> The "entry fiction" that excludable aliens are to be treated as if detained at the border despite their physical presence in the United States determines the aliens' rights with regard to immigration and deportation proceedings. It does not limit the right of excludable aliens detained within United States territory to humane treatment.

*Id.* at 1373.

We reasoned in *Lynch* that the sovereign should enjoy particularly broad discretion in the immigration context, because the power to decide which, and how many, outsiders may join our society is critical to national self-determination. *See id.* There are, however, no identifiable national interests that justify the wanton infliction of pain. *See id.* at 1373-74.

---

[3] *Id.* at 271 (citing *Plyler v. Doe*, 457 U.S. 202, 212 (1982) (stating that provisions of the Fourteenth Amendment "are universal in their application, to all persons within the territorial jurisdiction"); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953) (opining that "once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders").

[4] In *United States v. Angeles-Mascote*, 206 F.3d 529, 531 (5th Cir. 2000), this court made a plain distinction between actual entry into the United States and attempted entry, in the context of interpreting a grand jury indictment: "'[A]ctual entry' has been found by most courts to require (continued...)

(...continued)
both physical presence in the country as well as freedom from official restraint, while 'attempted entry' only requires that the person approach a port of entry and make a false claim of citizenship or non-resident alien status.").

4

We concluded that "whatever due process rights excludable aliens may be denied by virtue of their status, they are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials." *Id.* at 1374.

Gonzalez distinguishes *Lynch* because the aliens there were detained for ten days, but Martinez-Aguero was detained for only about six hours. This distinction fails, however, because Mezei (the alien detained at Ellis Island) was held captive for twenty-one months. *See Mezei*, 345 U.S. at 209. The operative distinction between *Lynch* and *Mezei* is that Mezei brought a due process challenge to his exclusion proceeding, but Lynch challenged the official use of excessive force. The "entry fiction" applies to the former claim but not the latter. Because the "entry fiction" does not bar Martinez-Aguero's suit, and because she was concededly within the territorial jurisdiction of the U.S. (though outside the port of entry) when the alleged incident occurred, *Lynch* counsels that she should receive the Fifth Amendment's protection against the use of excessive force.

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), however, the Court held that "*all* claims that law enforcement officers have used excessive forceSSdeadly or notSSin the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." The Court reasoned that because "the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'sub-

stantive due process,' must be the guide for analyzing these claims." *Id.*

*Graham* does not call into question the part of *Lynch* that limits the applicability of the "entry fiction" to the context of immigration and deportation proceedings. Instead, it merely locates the right to be free from excessive use of force in the express textual guarantees of the Fourth Amendment. *Graham* does, however, require us to analyze Martinez-Aguero's excessive force claim, first and foremost, as a claim alleging an unreasonable seizure under that amendment.[5] We turn now to whether she has standing under the Fourth Amendment to challenge unlawful arrest and the excessive use of force.

In pre-*Verdugo-Urquidez* cases, the Supreme Court had assumed, and we have explicitly held, that the Fourth Amendment applies to aliens.[6] Martinez-Aguero argues that the

---

[5] Because the Fourth Amendment applies to Martinez-Aguero, we need not decide whether the due process protection embodied in *Lynch* continues to apply of its own force to a case where the protection of the Fourth Amendment is unavailable. We note, however, that because *Graham* by its own terms, 490 U.S. at 395, applies only to "free citizens," whereas *Lynch*, 810 F.2d at 1373, applies to all "excludable aliens detained within United States territory," *Lynch* may sweep more broadly than does the Fourth Amendment guarantee.

[6] *See, e.g.*, *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973) (stating that a Mexican citizen was entitled to Fourth Amendment protection under statute that purports to authorize warrantless searches within a reasonable distance from the U.S. border); *United States v. Cortes*, 588 F.2d 106, 110 (5th Cir. 1979) ("Once aliens become subject (continued...)

definition of "the People" in *Verdugo-Urquidez*, seemingly limiting the class of aliens that deserve protection to those with "substantial connections" to the United States, is not binding, because Justice Kennedy, though joining the majority opinion in full, specially concurred to express disagreement with the majority's textual analysis.

Justice Kennedy appeared to indicate that the key factor in his decision was the extraterritorial application of the Fourth Amendment: "If the search had occurred in a residence within the United States, I have little doubt that the full protections of the Fourth Amendment would apply." *Verdugo*, 494 U.S. at 278 (Kennedy, J., concurring). Justice Kennedy's formulation would be favorable to Martinez-Aguero, because he appears to believe that the Fourth Amendment's protection is coextensive with U.S. territorial boundaries.

If, however, we take at face value the fact that Justice Kennedy joined the opinion of the Court, *see Verdugo*, 494 U.S. at 275, there are five votes for the proposition that "aliens receive constitutional protections when they have come within the territory of the United States *and* developed substantial connections with the country." *Id.* at 271 (emphasis added).[7] We need not decide whether *Verdugo-Urquidez* is controlling, because even under the more demanding test, Martinez-Aguero has "developed substantial connections with the country" and earned the protection of the Fourth Amendment.

Gonzalez contends that Martinez-Aguero lacked "substantial connections" with the United States because, besides having an expired visa and applying for a new one, her only connection consisted of periodic visits to assist her aunt with retrieving her Social Security check. Gonzalez cites *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 60 & n.17 (D.D.C. 1998), which held that regular visits to family members do not qualify as "substantial connections." On the contrary, Martinez-Aguero cites language in *Verdugo-Urquidez*, 494 U.S. at 273, suggesting that aliens with substantial connections are those who are in this country "voluntarily and presumably [have] accepted some societal obligations." She argues that her regular and lawful entry of the United States pursuant to a valid border-crossing card[8] and her acquiescence in

---

[6](...continued)
to liability under United States law, they also have the right to benefit from [Fourth Amendment] protection."); *United States v. Cruz*, 581 F.2d 535, 537 (5th Cir. 1978) (en banc), *overruled on other grounds by United States v. Causey*, 834 F.2d 1179 (5th Cir. 1987) (stating that law enforcement "must . . . be performed with due regard to the Fourth Amendment to the Constitution, which affords citizen and alien alike protection against illegal stops, searches, and arrests"); *United States v. Cadena*, 585 F.2d 1252, 1262 (5th Cir. 1978), *overruled on other grounds by United States v. Michelena-Orovio*, 719 F.2d 738 (5th Cir. 1983) (observing that "once we subject . . . aliens to criminal prosecution, they are entitled to the equal protection of all our laws, including the Fourth Amendment").

[7] *See also United States v. Emerson*, 270 F.3d 203, 228 (5th Cir. 2001) (citing favorably the definition of the principal *Verdugo* opinion in the course of holding that the phrase "the people" as used in the Second Amendment confers a personal right to bear arms).

[8] Though Martinez-Aguero arguably did not have a valid border-crossing card the day she was arrested, she reasonably relied on the statements of officials at the U.S. consular office that her
(continued...)

6

the U.S. system of immigration constitute her voluntary acceptance of societal obligations, rising to the level of "substantial connections."[9]

Martinez-Aguero is correct. There may be cases in which an alien's connection with the United States is so tenuous that he cannot reasonably expect the protection of its constitutional guarantees; the nature and duration of Martinez-Aguero's contacts with the United States, however, are sufficient to confer Fourth Amendment rights. It follows that she may bring a *Bivens* claim for unlawful arrest and the excessive use of force under the Fourth Amendment.

### B.

Because Martinez-Aguero is entitled to Fourth Amendment protection, it is obvious that she has alleged facts that, if true, would establish that Gonzalez violated those rights. As to false arrest, Gonzalez arrested Martinez-Aguero pursuant to 18 U.S.C. § 111, which reads as follows: "Whoever . . . forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person . . . while engaged in or on account of the performance of official duties . . . shall . . . be fined under this title or imprisoned not more than one year, or

---

[8](...continued)
stamped, expired card would suffice. *See Raley v. Ohio*, 360 U.S. 423, 426 (1959) (holding that "convicting a citizen for exercising a privilege which the State had clearly told him was available to him" would be "to sanction an indefensible sort of entrapment by the State").

[9] *Cf. United States v. Tehrani*, 826 F. Supp. 789, 793 n.1 (D. Vt. 1993) (holding that defendants voluntarily gaining admission to the United States for a temporary visit as tourists qualified as "substantial connections").

both[.]"

Under the Fourth Amendment, an arrest is reasonable if supported by probable cause. *See Atwater v. City of Lago Vista*, 195 F.3d 242, 244 (5th Cir. 1999) (en banc). We define probable cause as "reasonable ground for belief . . . supported by less than prima facie proof but more than mere suspicion." *United States v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir. 1980). Taking her version of the facts as true, we must conclude that Martinez-Aguero did nothing to interfere with Gonzalez's official duties; rather, the arrest was entirely without provocation. As the district court concluded, "[a]ny argument to the contrary would be patently absurd."

This reasoning applies with equal force to Martinez-Aguero's claim of excessive force. In *Graham*, 490 U.S. at 396, the reasonableness of official use of force turns on "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." The relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Again, Martinez-Aguero plainly prevails under the facts she presents. She alleges that she was entirely docile and compliant (with the exception of one stray remark not intended for Gonzalez to hear); therefore, there could be no state interest in subduing her using force. In short, she has presented facts sufficient to survive summary judgment on both claims.

### C.

Finally, we must determine whether Mar-

tinez-Aguero's rights were "clearly established" at the time of the incident. She contends that Gonzalez has waived any right to make this argument. Indeed, the issue that Gonzalez presents on appeal, as described and discussed in his brief, deals exclusively with the question whether aliens enjoy Fourth or Fifth Amendment protection at all. The words "clearly established" appear precisely once, when Gonzalez states the test for qualified immunity. Because, however, one could read Gonzalez's argument that the relevant cases do not support *any* constitutional protections for Martinez-Aguero as implicitly containing the lesser argument that the protections are not clearly established, we therefore consider the issue on the merits.

Gonzalez could argue that Martinez-Aguero's Fourth Amendment rights were not clearly established because courts have split on the precedential value of *Verdugo-Urquidez*; because it is uncertain how the Court intended the "substantial connections" test to be applied; and because the Court seemed explicitly to reserve the question whether illegal aliens would have Fourth Amendment rights on U.S. soil.[10] But, decisions pre-dating *Verdugo-Urquidez*, including cases from this circuit, state unequivocally that aliens are entitled to Fourth Amendment protection.[11]

Also, the inquiry into whether rights are clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. If Martinez-Aguero deserves any Fourth Amendment or due process protection at all, it surely must extend to the right to be free of entirely meritless arrests and the excessive use of force. *Lynch* plainly confers on aliens in disputes with border agents a right to be free from excessive force, and no reasonable officer would believe it proper to beat a defenseless alien without provocation, as Martinez-Aguero alleges.

The logic of *Lynch* applies equally to arresting an alien without cause: "Counsel has not suggested and we cannot conceive of any national interests that would justify [the practice] simply because that person is an excludable alien." *Lynch*, 810 F.2d at 1374. This reasoning is particularly compelling when an alien has made a good-faith effort to comply with federal requirements for obtaining a temporary visa and has made frequent use of a border-crossing card to visit the country in the past. On these facts, no officer would reasonably conclude that Martinez-Aguero lacked protection against suspicionless arrest.

We AFFIRM the denial of summary judgment, and REMAND to the district court for further proceedings.

---

[10] *Verdugo-Urquidez*, 494 U.S. at 272 (stating that *dicta* in a previous case are "not dispositive of how the Court would rule on a Fourth Amendment claim by illegal aliens in the United States if such a claim were squarely before us").

[11] *See supra* n.6 and accompanying text.