DENNIS, Circuit Judge,
concurring in part and dissenting in part:
I concur in the majority’s dismissal of the Fifth Amendment claim in this case, because I agree that the defendant, Armando Portillo-Munoz, waived his right to argue that 18 U.S.C. § 922(g)(5) violates his Fifth Amendment due process rights.
However, I respectfully dissent from the majority’s dismissal of Portillo-Munoz’s Second Amendment claim. The majority concludes that Portillo-Munoz, a ranch hand who has lived and worked in the United States for more than 18 months, paid rent, and helped supported a family— but who committed the misdemeanor of illegally crossing the border — is not part of *443 “the people.” Supreme Court and Fifth Circuit precedent recognize that the phrase “the people” has the same meaning in the First,[1] Second,[2] and Fourth[3] Amendments. The majority’s determination that Portillo-Munoz is not part of “the people” effectively means that millions of similarly situated residents of the United States are “non-persons” who have no rights to be free from unjustified searches of their homes and bodies and other abuses, nor to peaceably assemble or petition the government. In my view, Portillo-Munoz clearly satisfies the criteria given by the Supreme Court and our court for determining whether he is part of “the people”: he has come to the United States voluntarily and accepted some societal obligations. See United States v. Verdugo-Urquidez, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (“[Ajliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country”); Martinez-Aguero v. Gonzalez, 459 F.3d 618, 625 (5th Cir.2006) (“[A]liens with substantial connections are those who are in this country ‘voluntarily and presumably [have] accepted some societal obligations.’ ” (second alteration in original) (quoting Verdugo-Urquidez, 494 U.S. at 273, 110 S.Ct. 1056)).
Of course, whether 18 U.S.C. § 922(g)(5) violates the Second Amendment is a separate question from whether Portillo-Munoz is part of “the people” who have First, Second, and Fourth Amendment rights. I would remand for the district court to consider in the first instance the applicable level of scrutiny under the Second Amendment, and whether the provision passes muster under that level of scrutiny.[4]
A.
The majority’s interpretation of the “the people” has far-reaching consequences: as the Supreme Court recognized in District *444 of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and Verdugo-Urquidez, the same set of “people” protected by the Second Amendment are also protected by the First and Fourth Amendments. See Heller, 554 U.S. at 580, 128 S.Ct. 2783 (explaining that “ ‘the people’ seems to have been a term of art employed in select parts of the Constitution,” and that the phrase refers to those who are “protected by the Fourth Amendment, and by the First and Second Amendments.” (quoting Verdugo-Urquidez, 494 U.S. at 265, 110 S.Ct. 1056) (quotation marks omitted)). Indeed, the author of today’s majority opinion recognized as much in United States v. Emerson, 270 F.3d 203 (5th Cir.2001). In Emerson, this court concluded, as the Supreme Court would, several years later in Heller, that the Second Amendment confers an individual rather than collective or quasi-collective right to bear arms. 270 F.3d at 260. One of the rationales the Emerson court gave for adopting the “individual rights model” was that “[i]t gives the same meaning to the words ‘the people’ as used in the Second Amendment phrase ‘the right of the people’ as when used in the exact same phrase in the contemporaneously submitted and ratified First and Fourth Amendments.” Id. at 227. The court further explained:
There is no evidence in the text of the Second Amendment, or any other part of the Constitution, that the words “the people” have a different connotation within the Second Amendment than when employed elsewhere in the Constitution. In fact, the text of the Constitution, as a whole, strongly suggests that the words “the people” have precisely the same meaning within the Second Amendment as without.
Id. at 227-28.
In view of these precedents, I find the majority’s attempt, in dicta, to limit its reasoning to the Second Amendment context to be unconvincing. The majority labels the Second Amendment an “affirmative right” and the Fourth Amendment a “protective right.” Maj. Op. 440^41. This distinction, unfortunately, is unpersuasive. The majority’s characterization of the Second Amendment as an affirmative right is contradicted by Heller: “[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it ‘shall not be infringed.’” 554 U.S. at 592, 128 S.Ct. 2783. Both the Second and Fourth Amendments plainly refer to the right of “the people” to be free from unwarranted governmental intrusion — whether in the form of unreasonable searches or seizures, or in the form of infringements on the right to bear arms. See U.S. Const, amend. II (stating that “the right of the people to keep and bear Arms shall not be infringed” (emphasis added)); U.S. Const, amend. IV (“The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause.... ” (emphasis added)). Moreover, the majority’s reasoning implicates not only the Fourth Amendment, but also the First Amendment, which similarly prohibits Congress from “abridging ... the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.” U.S. Const, amend. I (emphasis added).
There are countless persons throughout Texas, Louisiana, and Mississippi, who, like Portillo-Munoz, work for employers, pay rent to landlords, and support their loved ones, but are unlawfully residing in the United States. The majority’s reason *445 ing renders them vulnerable — to governmental intrusions on their homes and persons, as well as interference with their rights to assemble and petition the government for redress of grievances — with no recourse.
The majority’s categorical conclusion that persons like Portillo-Munoz are not part of “the people” is also incongruous with the holding of the Supreme Court in Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982): “Whatever his status under the immigration laws, an alien is surely a ‘person’ in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as ‘persons’ guaranteed due process of law by the Fifth and Fourteenth Amendments.” Id. at 210, 102 S.Ct. 2382 (citing cases). It would be strange for the same founders who contemporaneously adopted the First, Second, Fourth, and Fifth[5] Amendments to have intended for the Fifth Amendment to cover a different class of persons than the other three amendments, considering that “people” is merely the plural of “person.”
B.
The sole basis for the majority’s conclusion that Portillo-Munoz should not be considered part of “the people” is that he is unlawfully present in the United States. However, this rationale is wholly unsupported by the applicable precedents.
As the majority acknowledges, Heller did not address the question of whether noncitizens, lawfully or unlawfully present in the United States, have Second Amendment rights. Importantly, in both Heller and Verdugo-Urquidez, a Fourth Amendment case, the Supreme Court indicated that “the people” includes people who have developed “sufficient connection” with the United States. The Heller Court, reiterating the analysis given in Verdugo-Urquidez, explained:
“[T]he people” seems to have been a term of art employed in select parts of the Constitution.... [Its uses] suggest] that “the people” protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.
Heller, 554 U.S. at 580, 128 S.Ct. 2783 (alterations in original) (emphasis added) (quoting Verdugo-Urquidez, 494 U.S. at 265.110 S.Ct. 1056) (quotation marks omitted); see also Verdugo-Urquidez, 494 U.S. at 271, 110 S.Ct. 1056 (“[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country”). In Verdugo-Urquidez, the Court reasoned that an alien establishes substantial connections with this country when she or he (1) is voluntarily present in the United States and (2) “accept[s] some societal obligations.” 494 U.S. at 273, 110 S.Ct. 1056; see also Martinez-Aguero, 459 F.3d at 625 (“[A]liens with substantial connections are those who are in this country ‘voluntarily and presumably [have] accepted some societal obligations.’ ” (second alteration in original) (quoting Verdugo-Urquidez, 494 U.S. at 273.110 S.Ct. 1056)).[6]
*446 In Verdugo-Urquidez, the Supreme Court concluded that an alien who was brought to the United States against his will, for the sole purpose of subjecting him to a criminal prosecution, was not entitled to Fourth Amendment protections because he “had no voluntary connection with this country that might place him among ‘the people’ of the United States,” and thus that the warrantless search of his properties by United States government agents in Mexico did not violate the Fourth Amendment. 494 U.S. at 273, 110 S.Ct. 1056. Nothing in Verdugo-Urquidez requires that the alien must be lawfully present in the United States in order to establish substantial connections. In fact, the Court expressly assumed for the sake of argument that aliens who are unlawfully present in the United States are protected by the Fourth Amendment. Id. (declining to decide the issue because “such a claim [was not] squarely before us,” but explaining that “assuming that [illegal] aliens would be entitled to Fourth Amendment protections,” such aliens would be different from the alien in Verdugo-Urquidez, provided that they “were in the United States voluntarily and presumably had accepted some societal obligations”). The Court also suggested that if the alien’s presence in the country, even if involuntary, had been “prolonged” for more than “a matter of days” when the search occurred, he could perhaps have been eligible to “claim the protection of the Fourth Amendment.” Id. at 272, 110 S.Ct. 1056.
In Martinez-Aguero, this court held that an alien who attempted to enter the United States in an unlawful manner was part of “the people” under the purposes of the Fourth.Amendment. 459 F.3d at 625. The alien, who did not reside in the United States but regularly crossed the border to visit family, attempted to enter with an expired visa, which American consular officials had incorrectly told her would suffice for her border crossings. Id. at 620. This court held that the alien’s “regular and lawful entry of the United States pursuant to a valid border-crossing card and her acquiescence in the U.S. system of immigration constitute her voluntary acceptance of societal obligations.” Id. at 625 (footnote omitted). The Martinez-Aguero court never indicated that attempting to comply with United States immigration laws is the only way that an alien can accept some societal obligations. On the contrary, the opinion suggested that the standard for establishing substantial connections is not high and that there would be few, if any, cases where an alien who was voluntarily within the United States *447 would be unable to establish such connections. Id. (“There may be cases in which an alien’s connection with the United States is so tenuous that he cannot reasonably expect the protection of its constitutional guarantees.... ” (emphases added)).
In the present case, Portillo-Munoz plainly satisfies both criteria of the substantial connections test under Verdugo-Urquidez and Martinez-Aguero: he is voluntarily present in the United States and has accepted several societal obligations. First, Portillo-Munoz came to and remained in the United States of his own volition. By contrast, in Verdugo-Urquidez, the Court concluded that the alien was not voluntarily present in the United States, because he had been brought to the country by the United States Marshals. 494 U.S. at 273, 110 S.Ct. 1056.
Portillo-Munoz has also accepted several societal obligations, a fact that is uncontested by the government. First, PortilloMunoz has accepted and fulfilled obligations to his American employers. At the time of his arrest, he had been working a steady job for six months, as a ranch hand in Dimmit, Texas, where he was responsible for planting and harvesting crops, as well as raising chickens. Portillo-Munoz obtained his firearm in order to protect his employer’s chickens from coyotes. Prior to his employment at the ranch, Portillo-Munoz worked at a dairy farm in Hereford, Texas, where he fed cattle and ensured that their feed was properly stored. Second, Portillo-Munoz accepted and fulfilled obligations to his landlord by paying rent for his home. Third, he accepted and fulfilled obligations to his girlfriend and her daughter by helping to financially support them. Finally, aside from unlawfully entering the United States (a misdemeanor punishable by fine or imprisonment of up to six months, 8 U.S.C. § 1325(a)), Portillo-Munoz has no criminal record or history of arrests. Many United States citizens have committed far more serious crimes, yet they still receive the constitutional protections given to “the people.”[7]
Moreover, Portillo-Munoz’s place in United States society resembles that of many others. The Supreme Court recognized in Plyler that millions of aliens who are unlawfully present in the United States are part of American society: “The Attorney General [William French Smith, who served under President Ronald Reagan] recently estimated the number of illegal aliens within the United States at between 3 and 6 million.... [T]he Attorney General noted that this subclass is largely composed of persons with a permanent attachment to the nation.... [describing them as] ‘millions of illegal aliens, many of whom have become, in effect, members of the community.’ ” 457 U.S. at 219 n. 17, 102 S.Ct. 2382 (quoting J. Hearing before the Subcomm. on Impiigration, Refugees, and Int’l Law of the H. Comm, on the Judiciary and the Subcomm. on Immigration and Refugee Policy of the S. Comm, on the Judiciary, 97th Cong., 1st Sess., 9 (1981) (testimony of William French Smith)).
If an alien who undertook “periodic visits [to the United States] to assist her aunt *448 with retrieving her Social Security check” has substantial connections to this country, Martinez-Aguero, 459 F.3d at 625, then surely Portillo-Munoz does, as well. He has voluntarily come to the United States and resided here for over 18 months, developing substantial connections with this country by fulfilling societal obligations to his employers, his landlord, his girlfriend and her daughter. He is “in effect, [a] member[ ] of the community” like the aliens described in Plyler. 457 U.S. at 219 n. 17, 102 S.Ct. 2382. Therefore, he is part of “the people,” and is entitled to the protections of the Bill of Rights, including not only the Second Amendment, but also the First and Fourth Amendments.
C.
Finally, the majority cites a number of cases that are inapposite to the question presented in this case: whether PortilloMunoz is part of “the people.” The majority reasons that the cases it cites support the proposition “that the Constitution does not prohibit Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens.” Maj. Op. 442. Those cases may be relevant to whether 18 U.S.C. § 922(g)(5) violates • the Second Amendment. This dissent does not discuss that question, because, as explained above, I would remand for the district court to answer it in the first instance.
However, that is a distinct issue from the question which the majority purports to answer, and which accordingly is the focus of this dissent: whether aliens such as Portillo-Munoz are part of “the people,” and have any rights at all, under the First, Second, and Fourth Amendments. Because Portillo-Munoz has substantial connections with this country, and because the majority’s holding effectively nullifies the rights of countless others like him, I dissent from the majority’s dismissal of Portillo-Munoz’s Second Amendment claim.

. The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.” U.S. Const, amend. I (emphasis added).

. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” U.S. Const, amend. II (emphasis added).

. The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” U..S. Const, amend. IV (emphasis added).

. Since District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), courts of appeal have taken various approaches to scrutinizing laws regarding firearms. See, e.g., Nordyke v. King, 644 F.3d 776, 784-85 (9th Cir.2011) (applying a "substantial burden” test to determine whether to apply heightened scrutiny to county ordinance); United States v. Chester, 628 F.3d 673, 682-83 (4th Cir.2010) (applying intermediate scrutiny to review of § 922(g)(9)); United States v. Reese, 627 F.3d 792, 801-02 (10th Cir.2010) (applying intermediate scrutiny to review of § 922(g)(8)); United States v. Williams, 616 F.3d 685, 692-94 (7th Cir. 2010) (applying intermediate scrutiny to review of § 922(g)(1)); United States v. Skoien, 614 F.3d 638, 641-42 (7th Cir.2010) (en banc) (declining to label the level of scrutiny being applied, but upholding § 922(g)(9) because "logic and data establish a substantial relation between” the subsection and an "important governmental objective”); United States v. Marzzarella, 614 F.3d 85, 96-98 (3d Cir. 2010) (applying a sliding scale test to determine the appropriate level of scrutiny for evaluating § 922(k)).

. The Fifth Amendment states in relevant part: "No person shall ... be deprived of life, liberty, or property, without due process of law.” U.S. Const, amend. V.

. Although he joined and provided the fifth vote for the majority opinion in Verdugo-Urquidez, Justice Kennedy also appeared to de *446 part from its reasoning regarding the substantial connections test, explaining:
I cannot place any weight on the reference to "the people” in the Fourth Amendment as a source of restricting its protections. With respect, I submit these words do not detract from its force or its reach. Given the history of our Nation’s concern over warrantless and unreasonable searches, explicit recognition of "the right of the people” to Fourth Amendment protection may be interpreted to underscore the importance of the right, rather than to restrict the category of persons who may assert it.
494 U.S. at 276, 110 S.Ct. 1056 (Kennedy, J., concurring). Rather, “Justice Kennedy appeared to indicate that the key factor in his decision was the extraterritorial application of the Fourth Amendment: 'If the search had occurred in a residence within the United States, I have little doubt that the full protections of the Fourth Amendment would apply.' ” Martinez-Aguero, 459 F.3d at 624 (quoting Verdugo-Urquidez, 494 U.S. at 278, 110 S.Ct. 1056). Our court, in MartinezAguero, declined to decide whether the substantial connections test was controlling, because it determined that the alien satisfied the test, which was "more demanding” than any other potentially applicable test. Id. at 625. Likewise, in this case, for the reasons given below, Portillo-Munoz has also shown that he has substantial connections with this country.

. See, e.g., Dawson v. Delaware, 503 U.S. 159, 167, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992) (holding that the “First Amendment rights” of a defendant, who had convicted of murder, “were violated by the admission [in the sentencing phase] of [evidence of his membership in] the Aryan Brotherhood ... because the evidence proved nothing more than [the defendant’s] abstract beliefs”); United States v. Webster, 162 F.3d 308, 333 (5th Cir.1998) (“[The defendant’s] experience in police procedure, resulting from his lengthy criminal record, belies the assertion that he was unaware of his [Fourth Amendment] rights.... ”).