REVISED JUNE 29, 2011
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 13, 2011

Lyle W. Cayce
Clerk

No. 11-10086

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ARMANDO PORTILLO-MUNOZ

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before GARWOOD, GARZA, and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:

FACTS AND PROCEEDINGS BELOW

On July 10, 2010, the Castro County, Texas, Sheriff's department was notified that a person at the Rodeo Arena in Dimmit, Texas, was "spinning around" on a red motorcycle with a gun in his waistband. A Dimmit Police Officer arrived at the scene and found a .22 caliber handgun in the center console of a four-wheeler driven by defendant-appellant Armando Portillo-Munoz. Portillo indicated to the officers present that the gun was for killing coyotes. After searching his person, officers found a dollar bill in Portillo's pocket with a white powder substance inside the folds. Portillo was arrested and

booked in the Castro County jail for unlawfully carrying a weapon and for possession of a controlled substance. He admitted to being a native and citizen of Mexico illegally present in the United States. According to Portillo's Presentence Report (PSR), he first came to the United States in 2005 but left after six months. Portillo illegally reentered the United States in 2009 and had been present for one year and six months before this incident. At the time of his arrest, he was working as a ranch hand in Dimmit. He stated that he obtained the firearm to protect the chickens at the ranch from coyotes. He had been employed there since January 2010, prior to which he had worked at a dairy farm in Hereford, Texas. His PSR did not report any prior criminal history, arrests, or previous encounters with immigration officials.

Portillo was indicted on August 31, 2010 for one count of Alien, illegally and unlawfully present in the United States, in Possession of a Firearm under 18 U.S.C. § 922(g)(5). His attorneys filed a motion to dismiss, alleging that conviction under the statute would violate the Second Amendment and the Due Process Clause of the Fifth Amendment. The district court denied Portillo's motion to dismiss. Portillo then entered a conditional guilty plea on January 12, 2011. He admitted that he is a citizen and native of Mexico illegally present in the United States and that he knowingly possessed a firearm in or affecting commerce which had been shipped or transported in interstate commerce. The district court sentenced him to ten months imprisonment followed by three years of supervised release. Portillo filed a timely notice of appeal.

## DISCUSSION

### I.

### Second Amendment

Portillo raises two arguments on appeal: that his conviction under 18

U.S.C. § 922(g)(5) for being an illegal alien in possession of a firearm violates the Second Amendment and that his conviction violates the Fifth Amendment's Due Process Clause. We address the Second Amendment argument first.

We review de novo the constitutionality of federal statutes. United States v. Anderson, 559 F.3d 348, 352 (5th Cir. 2009). Portillo clearly reserved the right to appeal the denial of his motion to dismiss on Second Amendment grounds in his conditional guilty plea.

Under the laws of the United States, "[i]t shall be unlawful for any person . . . who, being an alien . . . illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(5). There is no question that Portillo's conduct violated this statute. We are only asked to decide if Portillo's conviction under this statute violates the United States Constitution. Whether the protections contained in the Second Amendment extend to aliens illegally present in this country is a matter of first impression in this circuit. Several district courts have previously considered the constitutionality of this statute, but none of our sister circuits have done so.

The text of the Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. const. amend. II. In 2008, the Supreme Court held in District of Columbia v. Heller that the Second Amendment guarantees an individual right to possess and carry weapons. 128 S.Ct. 2783 (2008). The individual laying claim to the Second Amendment's protections in

Heller was a United States citizen, so the question of whether an alien, illegal or legal, has a right to bear arms was not presented, and the Court took care to note that it was not purporting to "clarify the entire field" of the Second Amendment. Id. at 2821. However, the Court's language does provide some guidance as to the meaning of the term "the people" as it is used in the Second Amendment. The Court held the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. Furthermore, the Court noted that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset" before going on to say that "[w]e start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." Id. at 2790-91. The Court's language in Heller invalidates Portillo's attempt to extend the protections of the Second Amendment to illegal aliens.[1] Illegal aliens are not "law-abiding, responsible citizens" or "members of the political community," and aliens who enter or remain in this country illegally and without authorization are not Americans as that word is commonly understood.

Prior to its decision in Heller, the Supreme Court interpreted the meaning of the phrase "the people" in the context of the Fourth Amendment and indicated that the same analysis would extend to the text of the Second Amendment. In United States v. Verdugo-Urquidez, the Court held that its analysis of the Constitution "suggests that 'the people' protected by the Fourth Amendment,

---

[1]And, nothing in McDonald v. City of Chicago, 130 S.Ct. 3020 (2010), suggests otherwise.

and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 110 S.Ct. 1056, 1061 (1990). Portillo relies on Verdugo-Urquidez and argues that he has sufficient connections with the United States to be included in this definition of "the people," but neither this court nor the Supreme Court has held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally.[2]

Moreover, even if there were precedent for the proposition that illegal aliens generally are covered by the Fourth Amendment, we do not find that the use of "the people" in both the Second and the Fourth Amendment mandates a holding that the two amendments cover exactly the same groups of people. The purposes of the Second and the Fourth Amendment are different. The Second Amendment grants an affirmative right to keep and bear arms, while the Fourth Amendment is at its core a protective right against abuses by the government. Attempts to precisely analogize the scope of these two amendments is misguided, and we find it reasonable that an affirmative right would be extended to fewer groups than would a protective right. The Second Circuit laid out compelling reasons for why an illegal alien could not claim that a predecessor statute to

---

[2]Portillo cites to this court's decision in Martinez-Aguero v. Gonzalez as holding that a non-citizen illegally present in the United States was protected by the Fourth Amendment. 459 F.3d 618 (5th Cir. 2006). The alien in that case, Martinez-Aguero, was a Mexican national who visited the United States on a monthly basis using a visitor's visa. Prior to the incident at issue in the case, during which she was subjected to excessive force by a border-patrol agent, Martinez-Aguero had applied for an updated visa and was incorrectly told by United States immigration officials that she could use her old card in the interim period. The court did not implicitly or explicitly hold that illegal aliens as a class are covered by the Fourth Amendment, and the facts of the case are so very dissimilar from those in Portillo's case that we do not find the court's decision especially persuasive here.

section 922(g)(5) violated the Fifth Amendment right to equal protection by saying that "illegal aliens are those who . . . are likely to maintain no permanent address in this country, elude detection through an assumed identity, and – already living outside the law – resort to illegal activities to maintain a livelihood." United States v. Toner, 728 F.2d 115, 128-29 (2d Cir. 1984). The court went on to approvingly quote the district court's statement that "one seeking to arrange an assassination would be especially eager to hire someone who had little commitment to this nation's political institutions and who could disappear afterwards without a trace . . ." Id. at 129 (internal quotation marks omitted).

Additionally, the Supreme Court has long held that Congress has the authority to make laws governing the conduct of aliens that would be unconstitutional if made to apply to citizens. In Matthews v. Diaz, the appellees were lawful resident aliens challenging a federal law that limited eligibility to Medicare Part B to aliens who had been admitted for permanent residence and had also resided in the United States for at least five years. 96 S.Ct. 1883 (1976). The Supreme Court upheld both conditions as constitutional against a challenge under the Due Process Clause. The Court pointed out in its opinion that the crucial question was whether discrimination among different types of aliens was permissible, as contrasted with discrimination between aliens and citizens and held that "[n]either the overnight visitor, the unfriendly agent of a hostile foreign power, the resident diplomat, nor the illegal entrant, can advance even a colorable constitutional claim to a share in the bounty that a conscientious sovereign makes available to its own citizens and some of its guests." Id. at 1891 (emphasis in original). The Court went on to say that "[i]n

the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." Id.

The Court, in several cases striking down state laws restricting otherwise lawful activities in which aliens could engage, has emphasized that the rights thus protected were those of aliens who were lawful inhabitants of the states in question. In 1915, the Supreme Court held in Truax v. Raich that the complainant, a native of Austria admitted for residency in the United States, was entitled to equal protection under the 14th Amendment because he was "lawfully an inhabitant of Arizona." 36 S.Ct. 7, 9 (1915). See also id. at 10 (states cannot "deny to lawful inhabitants . . . the ordinary means of earning a livelihood."). See also Kwong Hai Chew v. Colding, 73 S.Ct. 472, 477 & n.5 (1953); Torao Takahashi v. Fish and Game Comm'n, 68 S.Ct. 1138, 1142, 1143 (1948). This court noted in Lynch v. Cannatella that "the Constitution does not forbid all differences in governmental treatment between citizens and aliens, or between aliens who have been legally admitted to the United States and those who are present illegally." 810 F.2d 1363, 1373 (5th Cir. 1987).

The courts have made clear that the Constitution does not prohibit Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens. We find that analysis persuasive in interpreting the text of the Second Amendment. Whatever else the term means or includes, the phrase "the people" in the Second Amendment of the Constitution does not include aliens illegally in the United States such as Portillo, and we hold that section 922(g)(5) is constitutional under the Second

7

Amendment.[3]

## II.

## Due Process Violation

Portillo argues that 18 U.S.C. § 922(g)(5) violates his Fifth Amendment due process rights, both on its face and as applied. We hold that Portillo waived the right to challenge the constitutionality of the statute on Fifth Amendment grounds. Portillo's conditional guilty plea explicitly says that Portillo is entitled to appeal the denial of his motion to dismiss "only as it relates to whether the statute in question 18 U.S.C. § 922(g)(5), violates the defendant's Second Amendment right to keep and bear arms and to self-defense." At Portillo's rearraignment hearing, the court again said that Portillo was reserving his right to appeal the order denying his motion to dismiss "as it relates to the statute in question, that is, 18 U.S.C. § 922(g)(5), in which you contend that the statute violates your Second Amendment right to keep and bear arms and to self defense." We hold that the text of the conditional guilty plea only reserves Portillo's right to appeal on the grounds that the statute violates the Second Amendment, thus we do not reach the merits of whether Portillo's due process rights were violated.[4]

---

[3]This case does not involve, and we do not speak to, the constitutional trial, personal bodily integrity, privacy or speech rights of illegal aliens; we speak only to whether the Second Amendment precludes Congress from limiting the actual, affirmative conduct of aliens while they are illegally present within this country. This is a pure question of law which the district court has correctly answered.

[4]If we were to reach the merits of Portillo's due process claim, we would find his arguments wholly unconvincing. The statute in question is a federal law, not a state law, and thus the Bill of Rights applies directly to the statute without need for incorporation. Since the Second Amendment explicitly provides for a constitutional right to bear arms, Portillo cannot look to the due process clause as an additional source of protection for a right to keep and bear arms. See Graham v. Connor, 109 S.Ct. 1865, 1871 (1989).

CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Portillo's motion to dismiss.

AFFIRMED